# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR-11-35-BLG-RFC |
| Plaintiff, | **ORDER DENYING MOTIONS TO SUPPRESS AND FOR ADMISSION OF LAY OPINION TESTIMONY** |
| vs. | |
| ALEX MEDICINE HORSE, Jr. | |
| Defendant. | |

## I. INTRODUCTION

Defendant Alex Medicine Horse is charged in a two-count Indictment with Aggravated Sexual Abuse, in violation of 18 U.S.C. §§ 1153 and 2241(c) and Sexual Abuse, in violation of 18 U.S.C. §§ 1153(a) and 2242(2)(A). *Doc. 1*. The Indictment alleges that in June 2010, at Lodge Grass, on the Crow Indian Reservation, Medicine Horse knowingly engaged in a sexual act with a person under the age of twelve (Count I) who was incapable of appraising the nature of the conduct (Count II). Count I carries a mandatory minimum thirty years to life imprisonment, while Count II subjects Medicine Horse to a possible life sentence.

Pending before the Court are Medicine Horse's Motion to Suppress[1] (*doc.*

---

[1] Initially Medicine Horse moved to have the Indictment dismissed for prosecutorial misconduct, and alternatively, for suppression of his confession. But Medicine Horse withdrew

1

34) and Motion to Allow Lay Opinion Testimony (*doc. 44*). The motion to suppress alleges that the FBI polygrapher coerced him into waiving his *Miranda* rights and falsely confessing to the charged crimes. The second motion asks the Court to consider lay opinion testimony from a criminal defense attorney that the tactics employed at the subject interview were coercive and resulted in a false confession. An evidentiary hearing was held May 9, 2012. For the following reasons, both motions must be denied.

## II.  MOTION TO ADMIT LAY OPINION TESTIMONY

Medicine Horse's essential claim is that since polygraph evidence is *per se* inadmissible, and it was not used in the instant case to exclude potential suspects or to corroborate other witness's testimony, it was used as a ruse to elicit a confession. Medicine Horse asks the Court to consider the testimony of attorney Robert L. Stephens, Jr. in deciding whether his confession was obtained by improper coercion. The issue arose during the suppression hearing, when Medicine Horse called Stephens as a witness. The Court was uncertain of the admissibility of such testimony, so Stephens made an offer of proof and the parties were ordered to brief the issue.

---

the motion to dismiss upon learning that the Assistant U.S. Attorney was not involved in the decision to administer the polygraph and interview Medicine Horse. *Doc. 43.*

In his brief, Medicine Horse asserts that Stephens was asked to "review the circumstances of Alex Medicine Horse's polygraph examination and describe the procedures employed by the Government polygrapher in the context of the voluntariness of the Defendant's admissions and/or confession." *Doc. 44-1, p. 2.* Medicine Horse further asserts Stephens would have testified concerning:

- the usual practice of the polygrapher in this case, *i.e.* that the polygrapher had already identified the Defendant as a target defendant and the polygraph was simply a ruse to give Agent Smiedala an opportunity to interrogate this defendant.

- his specific knowledge gained from an investigation after one of his clients was subjected to the coercive type of examination conducted by Agent Smiedala.

- the coercive environment in the post-polygraph interrogation by Smiedala, including: a) a controlled environment by the interrogator in a restricted physical space; b) the so-called neutral examiner becomes confrontational and aggressive in a physical sense by invading the physical space of the defendant; c) the previously-established trust relationship is abruptly changed by verbally aggressive and demanding and/or accusatory interrogation techniques; and d) the previously neutral examiner uses verbal threats of potential consequences, *i.e.* jail, if the defendant does not confess.

- the common threat of physical and psychological isolation, accompanied by verbal badgering and invasion of the subject's physical space, which is a form of physical intimidation, including threats of incarceration.

- the polygraph procedure, in which the examiner gains the trust of the subject defendant, renders the defendant psychologically vulnerable and, if the level of discomfort is perceived to be sufficiently threatening, the subject will say what his antagonist wants the subject to say in order to avoid the continuing psychological stress. Once the polygrapher has

abandoned his pretense of neutrality and secured the admission and/or confession, he then calls in another agent in order to insulate the improper questioning by the polygrapher. The outside agent then records the confession with the tutelage and instructions of the polygrapher.

- the defendant is duped into being subjected to a third degree because he is led to believe that the polygraph examination will be a legitimate examination. It is within the context of the polygraph examination that the consent to the polygraph and the waiver of Miranda occur. At no time is the subject advised that there will be an accusatory and/or psychologically stressful interrogation by the polygrapher.

- based upon his own personal knowledge acquired by his own clients experience with the procedure, as well as his investigation into other criminal defense attorneys' experiences with the procedure, Stephens would opine that the environment was coercive and there is a high potential for coerced, involuntary or false confession.

*Id.*, at pp. 2-4.

The admissibility of lay opinion testimony is governed by Rule 701

Fed.R.Evid., which provides:

> If the witness is not testifying as an expert, the witnesses' testimony in the form of opinion or inferences is limited to those opinions or inferences which are: a) rationally based on the perception of the witness; b) helpful to a clear understanding of the witness testimony or the determination of a fact in issue; and c) not based on scientific, technical or specialized knowledge within the scope of 702, FRE.

Part (a) and (b) of Rule 701 require that opinion testimony of lay witnesses must

be "predicated upon concrete facts within their own observation and

recollection–that is facts perceived from their own senses, as distinguished from

4

their opinions or conclusions drawn from such facts." *United States v. Durham*, 464 F.3d 976, 982 (9th Cir. 2006). The final limitation, part (c), was added in 2000 to prevent lay testimony disguised as expert testimony governed by Rule 702 Fed.R.Evid. *Id.* It is also noteworthy that Rule 701 does not interdict all inference drawing by lay witnesses, but the inferences must be tethered to perception, to what the witness saw or heard. *United States v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000).

Notwithstanding Defendant's claim that his testimony would be based on his personal observations and investigation, Stephens admitted at the hearing that he did not witness the polygraph exam and subsequent interview in this case, nor has he ever witnessed an FBI polygraph exam. Rather, Stephens's opinion that the procedure followed in this case was coercive is based on two or three occasions where he witnessed other clients being subject to polygraph exams by state and local law enforcement officers, information from another client who was subjected to the same process by the FBI polygrapher who conducted the polygraph exam and interview in this case, and knowledge acquired from other attorneys whose clients have been interviewed by this polygrapher.

In the Court's view, Stephens was asked to form an opinion of what happened in this case by applying his specialized knowledge of FBI polygraph and

5

interview procedure to the facts of this case–that is, he was asked to give expert testimony. Even if the Court assumes that Stephens's knowledge of FBI polygraph and interview procedure is not based on scientific, technical or specialized knowledge, it is not rationally based on his perception.

The situation here is much different from that in *Durham*, where the witness was asked to give her opinion that the substance she observed being used was marijuana. 464 F.3d at 979. Similarly, *United States v. Graff* is not helpful to Medicine Horse because, in that case, the attorney witness testified as to opinions he gave the defendant on the legality of the defendant's conduct. 610 F.3d 1148, 1164-65 (9th Cir. 2010). Thus, unlike the present case, the testimony was based on his own perception. *Id.*

None of the other cases cited by Medicine Horse are helpful either. *See e.g., Bruce v. Astrue,* 557 F.3d 1113 (9th Cir. 2009) (wife allowed to give her opinion on how her husband's life was affected by his disability); *United States v. Fleischman,* 684 F.2d 1329 (9th Cir. 1982) (overruled on other grounds by *United States v. McConney,* 728 F.2d 1195, 1201 (9th Cir. 1982)) (DEA agent allowed to give his lay opinion that he observed defendant acting as a lookout); *United States v. Von Willie,* 59 F.3d 922, 929 (9th Cir. 1999) (police officer allowed to testify as a lay expert concerning nexus between drug trafficking and weapons because his

testimony was either based on his perceptions during the search or was common knowledge); *United States v. Pino-Noriega*, 189 F.3d 1089, 1097 (9th Cir. 1999) (declining to address whether testimony was improper lay opinion on plain error review because testimony did not affect the outcome of the trial); *United States v. Beck*, 418 F.3d 1008, 1014 (9th Cir. 2005) (allowing lay witness to opine as to identity of a person in photograph if the witness was familiar with the person).

For those reasons, Medicine Horse's Motion to Admit Lay Opinion Testimony (*doc. 44*) must be denied.

### III. MOTION TO SUPPRESS

Medicine Horse alleges he was unlawfully coerced into giving a false confession by the FBI polygrapher, Special Agent Stacey Smiedala. Specifically, Medicine Horse alleges Smiedala acted cordially during the initial polygraph exam to gain his trust and render him vulnerable, but after the polygraph, he became angry and accusatory, and Medicine Horse told Smiedala what he wanted to hear to stop the inquisition. The testimony at the hearing, however, reveals nothing improper. Rather, the preponderance of the evidence indicates that after being told that he failed the polygraph test, Medicine Horse voluntarily confessed to sexually abusing his granddaughter.

Medicine Horse was first suspected of child molestation on July 2, 2010,

7

when a doctor at Billings Clinic contacted the FBI and reported the victim had disclosed during an exam that Medicine Horse had touched her vagina with his hand. After further investigation, the FBI interviewed Medicine Horse on November 2 or 3, 2010. He denied the allegations, but agreed to take a polygraph test at the FBI office in Billings.

On November 4, 2010, Medicine Horse appeared at the Billings, Montana FBI Office for the scheduled polygraph exam. He was greeted by Special Agent Boruff and then waited in the waiting room. Soon thereafter, at a few minutes before 12:30 p.m., Smiedala appeared and introduced himself, dressed in a business suit with no visible firearm. Medicine Horse was then led to a 10' x 25' conference room containing a large table and chairs, where the polygraph exam and interview was conducted.

Smiedala began by explaining a polygraph consent form and an advice of rights form, which Medicine Horse signed at 12:30 and 12:35 p.m., respectively. Exs. A & B, *docs. 43-1 & 43-2*. Smiedala testified that he had Medicine Horse read the significant portions of the form aloud to ensure he understood them. The polygraph consent form made clear that Medicine Horse did not have to take a polygraph exam, could stop the test at any time, and could refuse to answer any particular question. Ex. A. The advice of rights form informed Medicine Horse of

8

his *Miranda* rights. Ex. B. By signing that form, he expressly agreed to answer questions without a lawyer present. *Id.* Smiedala testified that Medicine Horse never indicated he did not understand the forms or that he needed more explanation.

Smiedala then obtained some basic biographical information, including Medicine Horse's birth date, level of education, and employment and criminal history. In order to determine whether he was physically and mentally fit enough to participate in the polygraph exam, Smiedala also inquired about the Defendant's health, including whether he is on medications and how much sleep he had the night before. Through these questions, Smiedala learned that Medicine Horse had only completed the 11th grade, but had received a GED; was currently the Chairman of the Crow Indian Reservation Gaming Commission; and had previously worked in law enforcement, as a tribal police officer, a Big Horn County deputy sheriff, and a tribal prosecutor. Medicine Horse also disclosed that he took medication to control his high blood pressure, high cholesterol, a heart condition, and bad knees, and that he'd only had about four hours sleep the night before. Medicine Horse testified that he told Smiedala he would not pass the polygraph exam because of his medical conditions, but testified later that he wanted to take the polygraph exam because he was innocent and knew he would

pass it. In any event, Smiedala testified that Medicine Horse gave no indication that he was feeling ill or that he did not want to participate based on any health reasons. Smiedala saw no reason not to go forward.

Smiedala then generally discussed the polygraph process, how the test would occur, the questions that would be asked, as well as some physiological information about polygraph exams. His notes indicated that the polygraph questioning began at 1:02 p.m. Considering that the *Miranda* waiver was signed at 12:35, approximately 27 minutes were spent obtaining background information and explaining the polygraph process. Medicine Horse testified that at some time before the polygraph, Smiedala told him that if he passed the test, he would never see Smiedala again, but that if failed, Smiedala was going to be the one to testify and put him in jail. Smiedala, however, was clear that he never threatened Medicine Horse with jail.

The actual polygraph exam took eighteen or nineteen minutes, from 1:02 p.m. until 1:20 p.m. According to Smiedala, the polygraph exam revealed that Medicine Horse was "deception indicated" as to whether he sexually abused his granddaughter. At the conclusion of the exam, Smidaela came around the end of the table, sat closer to Medicine Horse, and questioned him, making clear his belief that Medicine Horse was lying. At some time later, between five and twenty

minutes depending on the account, Medicine Horse admitted to molesting his granddaughter and agreed to make a summary recorded confession. SA Tim Boruff then came in to the room with an audio recorder and recorded the summary confession. *Doc. 39*, ex. D. Medicine Horse was then allowed to leave. The entire process took approximately one and a half hours.

The summary confession played during the suppression hearing gave no indication that Medicine Horse was subject to a coercive interrogation.

Contrary to Medicine Horse's accusations, Smiedala testified that he did not become angry, raise his voice, call him degrading names, threaten him with jail, or verbally abuse him. Smiedala, however, readily admits that he accused Medicine Horse of lying. According to Smiedala, Medicine Horse was compliant during the entire process and never asked to leave or refused to answer questions. Medicine Horse's account of the post-polygraph interview was fairly consistent with Smidaela's. He testified that within four or five seconds of concluding the polygraph exam, Smiedala came around the table and sat two feet away from him and said, in a raised voice while pointing his finger at his face, that he wanted to know the truth because Medicine Horse was lying. Medicine Horse said he was not lying, but Smiedala continued to insist that he was. After between five and twenty of minutes of being called a liar, Medicine Horse testified that he told

11

Smiedala what he wanted to hear because he didn't want to go to jail, was concerned about his heart and elevated blood pressure, and wanted to get out of there. Finally, although Medicine Horse claimed there was some animosity towards him because he was Native American, he admits that Smiedala said nothing of the sort.

### A. THE CONFESSION WAS NOT OBTAINED IN VIOLATION OF MEDICINE HORSE'S FIFTH AND SIXTH AMENDMENT RIGHTS TO COUNSEL

Because Miranda rights are only required before the fruits of a custodial interrogation can be admitted in the government's case-in-chief, *Illinois v. Perkins*, 496 U.S. 292, 297 (1990), whether or not Medicine Horse waived his Miranda rights is only relevant if the Court determines he was "in custody" at the FBI office. Here, Medicine Horse specifically argues that his Fifth and Sixth Amendment rights to counsel were violated. But like *Miranda* rights in general, the Fifth Amendment right to counsel does not attach until a defendant is in custody. *United States v. Hines*, 963 F.3d 255, 256 (9th Cir. 1992). And since the Sixth Amendment right to counsel does not attach until initiation of the first adversarial proceedings against the defendant, and no charges were pending on the date of the interview, the Sixth Amendment right to counsel is inapplicable. *Id.*, at 258.

Regardless of the fact that Medicine Horse was not formally taken in FBI custody, he is nevertheless considered to be "in custody" for Miranda purposes if he had been "deprived of his freedom of action in any significant way." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The question is whether, considering the totality of the circumstances, a reasonable person in those circumstances would have felt he was not at liberty to terminate the interview and leave. *Id.*

Here, despite his alleged fear that he would be arrested if he asked to leave, it is not even a close question. Medicine Horse brought himself to the FBI Office, was told he was free to go at any time, did not have to submit to the examination, could refuse to answer any question, and, in fact, was released at the end of the interview, even though he admitted to molesting a child.

And even if he was in custody, Medicine Horse, the former law enforcement officer and tribal prosecutor, knowingly, voluntarily, and intelligently waived his right to counsel by signing the Advice of Rights Form, after being advised of his rights.

### B. MEDICINE HORSE'S STATEMENTS WERE VOLUNTARILY MADE

It is well-established that the confession or admission of an accused is admissible in evidence only if it was freely and voluntarily made, without duress,

fear, or compulsion in its inducement. This is because the use of an involuntary confession violates due process. *Colorado v. Connelly*, 479 U.S. 157, 163 (1986). The government must prove the voluntariness of a confession by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 480 (1972).

Although a confession obtained by physical coercion is per se involuntary, a confession alleged to be the product of psychological coercion is inadmissible only if, considering the totality of the circumstances, the accused's will was overborne when he confessed. *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993), *cert. denied*, 510 U.S. 894 (1993). Before a confession can be deemed involuntary, there must be some evidence of police coercion which is causally related to the confession. *Connelly*, 479 U.S. at 164, 167. In determining whether a statement was coerced, courts consider whether, under the totality of the circumstances, the statement was obtained by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001). "A statement is involuntary if it is extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *Id.* (Internal quotations omitted). In making such a determination, the Court must consider Medicine Horse's state of mind, the physical environment in which the

statement was given, and the manner in which he was questioned, including the interviewer's tone of voice, and whether promises or representations were made. *Pollard v. Galaza*, 290 F.3d 1030, 1033-34 (9th Cir. 2002).

Although Medicine Horse is not familiar with the justice system from the perspective of an accused, having only been arrested for disorderly conduct when he was a teenager, he is an almost seventy-year-old former law enforcement officer and tribal prosecutor who testified that he was educated about *Miranda* by a United States Attorney. Although he had heart problems and high blood pressure, there is nothing about Medicine Horse's physical or mental condition that would render him susceptible to coercion, nor is there any evidence Smiedala tried to take advantage of his physical or mental condition.

Most importantly, even if the Court accepts Medicine Horse's account as truth, at worst Agent Smiedala called him a liar in a raised voice, sat close and pointed his finger at him, and told him that if he lied Smiedala would testify against him and put him in jail. Such conduct, which occurred for twenty minutes at the most, does not constitute unlawful coercion.

Medicine Horse also alleges that the use of the polygraph, followed by an accusatory interview, is in itself improperly coercive. But other than the proffered testimony from Mr. Stephens, the Court is aware of no authority holding that the

15

use of a polygraph to determine a subject was being deceptive, followed by accusatory questioning citing the polygraph as evidence of deception, is unlawfully coercive. Rather, that is good police work.

Here, Medicine Horse testified that he wanted to take the polygraph exam to prove his innocence. Considering the totality of the circumstances, the preponderance of the evidence indicates Medicine Horse's statements were voluntary.

## IV. ORDER

For those reasons, **IT IS HEREBY ORDERED** that Medicine Horse's Motions to Admit Lay Testimony (*doc. 44*) and to Suppress (*doc. 34*) are **DENIED.**

Dated this ____ day of June, 2012.

Richard F. Cebull
United States District Judge